Delbert Eugene TERRELL, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–93–00254–CR.

Court of Appeals of Texas,
El Paso.

Dec. 29, 1994.

Discretionary Review Refused
April 12, 1995.

Robert J. Fickman, Houston, for appellant.

John B. Holmes, Dist. Atty., Harris County, Houston, for state.

Before BARAJAS, C.J., and KOEHLER and McCOLLUM, JJ.

## OPINION

McCOLLUM, Justice.

This is an appeal from a conviction for the lesser-included offense of murder.[1] Appellant waived his right to a jury trial and entered a negotiated plea of *nolo contendere.* The trial court found Appellant guilty, and in accordance with the plea bargain, assessed his punishment at 40 years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice with a deadly weapon finding. Appellant attacks the trial court's denial of a written motion to suppress his confession by three points of error. We affirm.

### FACTUAL SUMMARY

The record reflects that John Silva and Dennis Gafford, investigative sergeants assigned to the Homicide Division of the Houston Police Department, obtained a warrant for Appellant's arrest for the capital murder of Kerry LaMon Thomas. Silva and Gafford arrested Appellant at approximately 9:40 a.m. on September 26, 1991. The officers specifically advised Appellant of the charge. A patrol car transported Appellant to the Homicide Division in downtown Houston while Silva and Gafford continued to look for a co-defendant for a short time. Being unsuccessful in their search, they returned to the Homicide Division at approximately 11:30

that same morning. While Gafford prepared paperwork relative to the investigation, Silva met with Appellant in an interrogation room. Silva identified himself, again told Appellant why he had been arrested, and read him *Miranda*[2] warnings from a form entitled "Statement of Person in Custody." Appellant asked whether Silva thought that he should have an attorney appointed to represent him. Silva told Appellant that he could not make that decision for him. After thinking for a moment, Appellant said he would tell Silva about the incident. Appellant waived his rights, and beginning at approximately 11:50 a.m., Silva proceeded to take a written confession from him. After the statement was completed, Silva gave Appellant an opportunity to read it. Then, Silva stepped outside the room and two other police officers, Sgts. John Swaim and Stewart Kennedy, entered for the purpose of determining whether Appellant understood his rights and had voluntarily given his statement. After determining that he had, Appellant signed his statement at approximately 1:15 p.m. in the presence of Swaim and Kennedy. Kennedy testified that Appellant did not request an attorney or ask any questions in that regard. Silva reentered the interrogation room and permitted Appellant to telephone his mother. Upon escorting Appellant from the interrogation room, Silva learned for the first time from Sgt. Gafford that Appellant's family had retained an attorney for him and that he was waiting for Appellant down the hallway. Silva took Appellant to the area where Robert Fickman was waiting and permitted Appellant to speak with him privately. Appellant was not advised during the course of the interrogation that Fickman had been hired to represent him and was waiting to see him.

Sgt. Gafford testified that while Appellant was in the interrogation room, he received a message that Robert Fickman had telephoned him. Gafford returned the call at 12:03 p.m. and Fickman indicated that Appellant's family had asked him to represent

---

1. Appellant was originally indicted for the capital murder of Kerry LaMon Thomas. As part of the plea bargain, the trial court granted the State's motion to reduce the charge to murder and Appellant entered his plea thereto.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant. He requested to speak with Appellant, but Gafford told him that Silva was interviewing Appellant and he would not interrupt the process. The conversation ended. Fickman faxed a letter to the police department at 12:29 p.m. in which he requested that the interview be terminated. At around 1 p.m., he went to the station in person and met with Gafford. Gafford was unaware of the faxed letter until Fickman mentioned it. Fickman requested that he immediately be allowed to speak to Appellant or that Gafford tell Appellant that Fickman was present. He also asked that Gafford contact the District Attorney's Office to let them know of his requests. Gafford refused to interrupt the interview, but told Fickman that he had already contacted the District Attorney's Office with regard to the case and was expecting for his call to be returned within the next few minutes.

During the course of the interview, Gafford and Silva had no communications with one another. Thus, Silva was unaware of Gafford's discussions with Fickman and of Fickman's presence at the station until after the interview was completed and the statement obtained. Likewise, Silva did not tell Gafford that Appellant was in the process of giving a statement.

The record reflects that Appellant had previously been represented by Fickman on unrelated charges in 1988 and 1989. However, Fickman's representation of Appellant in that case had terminated prior to Appellant's arrest in the instant case. Appellant testified that he had occasionally spoken to Fickman when his brothers were in jail, but on those occasions he did not speak to Fickman about the details of their cases. Appellant and his mother, Madeline Fay Cobb, testified that they considered Fickman to be the "family lawyer." When Mrs. Cobb heard sometime during the morning hours of September 26 that Appellant had been arrested, she called Gafford and learned that Appellant was being questioned in connection with a murder. At approximately 11 a.m., Mrs. Cobb spoke to Fickman on the telephone and they entered into an oral agreement for Fickman to represent Appellant in connection with the capital murder charge.

Appellant testified at the suppression hearing that he did not recall whether his rights had been read to him by either Silva, Swaim, or Kennedy. He said that if he had known Fickman was at the station, he would not have given his statement without first speaking to him. Appellant admitted, however, that he did not invoke his right to an attorney when that right was explained to him and he did not ask to call Fickman. He also admitted that he gave his statement freely and voluntarily. The trial court denied the motion to suppress.

### DISCUSSION

#### Violation of Art. I, § 10 Right to Counsel Provision

◼ In Point of Error No. One, Appellant urges that the confession was taken in violation of the right to counsel provision of Article I, § 10 of the Texas Constitution. Appellant contends that *Dunn v. State*, 696 S.W.2d 561 (Tex.Crim.App.1985) and *Roeder v. State*, 768 S.W.2d 745 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd)[3] are dispositive of this claim. Although he recognizes that *Dunn* was overruled by *Goodwin v. State*, 799 S.W.2d 719 (Tex.Crim.App.1990), he contends that the holding in *Goodwin* was limited to the defendant's Fifth Amendment right to counsel and did not separately address the defendant's Article I, § 10 right to counsel. Thus, he contends that *Dunn* still stands as good law with respect to his state law claim. We disagree.

Our reading of *Goodwin* reveals that the Court of Criminal Appeals applied *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) to Goodwin's Art. I, § 10 claim as well as to his Fifth Amendment contention. The Court applied *Moran v. Burbine* to the state law claim because Goodwin based that contention primarily upon *Dunn*. The Court noted that *Dunn* analyzed Appellant's Art. I, § 10 claim in tandem with

---

**3.** In *Roeder*, the First Court of Appeals held that *Moran v. Burbine* overruled only the federal law claim raised in *Dunn* and did not effect the portion of the opinion finding error predicated upon Art. I, § 10. *Roeder*, 768 S.W.2d at 753–55.

his Fifth Amendment claim and relied primarily upon federal law, including *Burbine v. Moran,* 753 F.2d 178 (1st Cir.1985), in reaching its decision. *See Goodwin,* 799 S.W.2d at 729. Since the holding in *Dunn* did not represent an independent and adequate state ground, it was amenable to review by the United States Supreme Court and was implicitly overruled by *Moran v. Burbine. See Goodwin,* 799 S.W.2d at 731. Thus, *Dunn* and *Roeder* do not support Appellant's Art. I, § 10 claim. Because Appellant provides no independent analysis of Art. I, § 10 to support his argument that the Texas Constitution provides broader protection than the Fifth Amendment, we will apply *Moran v. Burbine* in determining whether Appellant's waiver of counsel was effective.

■ The Supreme Court held in *Moran v. Burbine* that events occurring outside of the presence of the suspect and entirely unknown to him can have no bearing on his capacity to comprehend and knowingly relinquish a constitutional right. *Moran v. Burbine,* 475 U.S. at 418, 106 S.Ct. at 1139; *Goodwin,* 799 S.W.2d at 730. Under the *Moran v. Burbine* analysis, police conduct such as what occurred in the instant case is irrelevant to the inquiry into the effectiveness of a defendant's waiver of counsel absent a showing that such conduct prevented the defendant from attaining awareness and comprehension of the information conveyed in the *Miranda* warnings and the consequences of abandoning those rights. *See Moran v. Burbine,* 475 U.S. at 424, 106 S.Ct. at 1142; *Goodwin,* 799 S.W.2d at 729–30. Appellant wholly failed to make such a showing in the suppression hearing.

Sgt. Gafford did not misinform Fickman with regard to Silva's interview of Appellant. He refused to interrupt the interview of Appellant to advise him that Fickman was present and available to talk with him, but neither Gafford nor Silva misled Appellant with regard to his right to counsel. When Appellant inquired of Silva whether he thought that Appellant should have an attorney advise him, Silva simply told Appellant that he could not give him advice and that the decision was up to him. Because this did not amount to an unequivocal invocation of the right to counsel, Silva's response was appropriate. *See Robinson v. State,* 851 S.W.2d 216, 223–24 (Tex.Crim.App.1991) (mere mention of the word "lawyer" or "attorney" does not automatically invoke the right to counsel; interrogating officers may continue questioning to discover whether accused wants to consult with counsel or proceed with interview without benefit of counsel); *Lucas v. State,* 791 S.W.2d 35, 45 (Tex.Crim.App. 1989). The record reflects that Appellant independently decided to forgo the advice of counsel and did not invoke that right even though he had been represented by Fickman in the past and allegedly considered him to be the family attorney. The record supports a finding that Appellant knowingly, voluntarily, and intelligently waived his right to counsel. Point of Error No. One is overruled.

### Due Process Violation

■ In his second point of error, Appellant contends that the confession was taken in violation of his right to due process guaranteed by the Fourteenth Amendment because Sgt. Gafford, who knew that Appellant was being questioned, failed to advise Appellant that Fickman was present and available to advise him. The State correctly observes that Appellant failed to preserve error because he did not present this objection to the trial court or obtain a ruling thereon. Consequently, error is not preserved. Tex. R.App.P. 52(a); *Harris v. State,* 827 S.W.2d 949, 961 (Tex.Crim.App.1992). Point of Error No. Two is overruled.

### Violation of Sixth Amendment Right to Counsel

In his final point of error, Appellant asserts that his confession was taken in violation of his Sixth Amendment right to counsel because Sgt. Gafford did not advise Appellant that counsel was available and seeking to consult with him during the interrogation. The State's sole response is that error is waived because Appellant did not present this objection to the trial court. Contrary to the State's assertion, our review of Appellant's motion to suppress and counsel's argument at the conclusion of the suppression hearing reveals that he objected on this

ground at trial. While the objection could have been argued more specifically, we find that it was sufficient to apprise the trial court of the nature and basis of objection, thus preserving error. TEX.R.APP.P. 52(a); *see Flores v. State,* 827 S.W.2d 416, 417 (Tex. App.—Corpus Christi 1992, pet. ref'd).

■■■ Unlike the Fifth Amendment, the Sixth Amendment guarantees more than an entitlement to counsel upon invocation. *Holloway v. State,* 780 S.W.2d 787, 793 (Tex. Crim.App.1989). Designed to remedy any imbalance in our adversary system, the Sixth Amendment promises that an accused is entitled to defense counsel in all criminal prosecutions. *Holloway,* 780 S.W.2d at 793. When an accused's Sixth Amendment right to counsel attaches to an offense for which adversarial proceedings have begun, he is entitled to the assistance of counsel at each "critical" stage of the prosecution, absent a valid waiver. *Upton v. State,* 853 S.W.2d 548, 553 (Tex.Crim.App.1993). If an accused is interrogated after the right to counsel has attached, and a statement obtained, the police may not use that statement against the accused unless counsel was present or waived when the statement was obtained. *Robinson,* 851 S.W.2d at 224, *citing Brewer v. Williams,* 430 U.S. 387, 399–404, 97 S.Ct. 1232, 1239–42, 51 L.Ed.2d 424 (1977).

■■■ The burden is on the State to prove such a waiver was made voluntarily, knowingly, and intelligently. *Upton,* 853 S.W.2d at 553; *Robinson,* 851 S.W.2d at 224. Waiver is shown as a matter of law with regard to pretrial questioning if an accused (1) who has not yet retained or been appointed counsel (2) decides voluntarily not to rely on his right to counsel and (3) that decision is made with the understanding that he could remain silent and request a lawyer and that the State could use any statement he gave against him. *Robinson,* 851 S.W.2d at 224, *citing Patterson v. Illinois,* 487 U.S. 285, 297, 108 S.Ct. 2389, 2397, 101 L.Ed.2d 261 (1988). *Miranda* waivers may be sufficient to also show the voluntary relinquishment required for waiver of the Sixth Amendment right to counsel. *Patterson v. Illinois,* 487 U.S. at 292–93, 108 S.Ct. at 2395. Recognizing that the trial court is the sole fact finder at a

suppression hearing, we apply a deferential standard of review to a trial court's findings to determine whether they have evidentiary support in the record. *Upton,* 853 S.W.2d at 553.

■■■ We must first address whether Appellant's Sixth Amendment right to counsel had attached prior to his interrogation. The Sixth Amendment right to the assistance of counsel does not attach prior to the initiation of adversary judicial proceedings whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Green v. State,* 872 S.W.2d 717, 719 (Tex.Crim.App.1994); *State v. Garibay,* 838 S.W.2d 268, 271 (Tex.App.—El Paso 1992, no pet.). A felony complaint was filed against Appellant in this cause on September 24, 1991 and the arrest warrant was obtained the same day.

As recently noted by the Court of Criminal Appeals, it is not entirely clear what events may serve to initiate adversary judicial proceedings sufficient to cause the Sixth Amendment right to counsel to attach. *See Green,* 872 S.W.2d at 720. It has been held that an arrest alone, with or without a warrant, does not trigger adversarial judicial proceedings. *Garcia v. State,* 626 S.W.2d 46, 53 (Tex.Crim. App.1981); *State v. Garibay,* 838 S.W.2d at 271. However, a two judge panel of the Court of Criminal Appeals held in *Barnhill v. State,* 657 S.W.2d 131, 132 (Tex.Crim.App. 1983) that the filing of a felony complaint sufficiently initiated adversary proceedings to cause attachment of the Sixth Amendment right to counsel. Although it did not decide the issue, the Court stated in *Green* that *Barnhill* is consistent with, if not dictated by, precedent from the United States Supreme Court. *Green,* 872 S.W.2d at 720, *citing Moore v. Illinois,* 434 U.S. 220, 228, 98 S.Ct. 458, 464, 54 L.Ed.2d 424 (1977), *Brewer v. Williams,* 430 U.S. at 399, 97 S.Ct. at 1239–40, *and Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). We hold that Appellant's Sixth Amendment right to counsel attached upon his arrest pursuant to a felony complaint. *Barnhill,* 657 S.W.2d at 132; *Dams v. State,* 872 S.W.2d 325, 328 (Tex.App.—Beaumont 1994, no pet.). Quite clearly, Appellant's interrogation by police

officers was a "critical stage" so as to invoke the right to counsel under the Sixth Amendment. *Holloway*, 780 S.W.2d at 793.

 Having determined that the right to counsel had attached and that Appellant's interrogation was a critical stage of his prosecution, we still must determine whether the failure to advise Appellant that an attorney was present and requesting to see him violated the guarantee of the Sixth Amendment. In *Holloway*, the Court of Criminal Appeals discussed at length the right to counsel under the Fifth and Sixth Amendments and noted the differences between those rights. *See Holloway*, 780 S.W.2d at 789–96. The Court held that the Sixth Amendment, unlike the Fifth Amendment, protects the attorney-client relationship once it has been established and prohibits the State from initiating interrogation of a represented defendant without notice to counsel. *See Holloway*, 780 S.W.2d at 794–96. Thus, it is necessary that the attorney-client relationship be established before the protection of the Sixth Amendment will be afforded to that relationship. *See Upton*, 853 S.W.2d at 557; *Holloway*, 780 S.W.2d at 795.

Appellant's point of error assumes without discussion of the facts or pertinent law that the attorney-client relationship had been established prior to the time the confession was taken. In making this same assertion elsewhere in his brief, Appellant pointed only to the evidence which showed that Fickman had previously represented him on an unrelated case and that his mother retained Fickman to represent him in this case. The only other evidence which could even arguably support a finding that the relationship existed was Appellant's testimony that, in his opinion, he had a "pre-existing attorney-client relationship" with Fickman. He apparently based his opinion solely on the prior representation and the fact that he occasionally called Fickman for advice.

As will be discussed hereinafter, the Court of Criminal Appeals held in *Upton v. State* that the attorney-client relationship had been established under the facts of that case. *See Upton*, 853 S.W.2d at 557. Even though the Court did not specifically discuss how or when the relationship is established for Fifth and Sixth Amendment purposes, the Court's holding that the relationship existed in that case is consistent with principles applied in several civil cases. *See e.g., Yaklin v. Glusing, Sharpe & Krueger*, 875 S.W.2d 380 (Tex. App.—Corpus Christi 1994, no writ); *Kotzur v. Kelly*, 791 S.W.2d 254 (Tex.App.—Corpus Christi 1990, no writ); *Parker v. Carnahan*, 772 S.W.2d 151 (Tex.App.—Texarkana 1989, writ denied). Even though the ultimate legal issues involved in these civil cases differ from that which is involved here, we believe that the principles applied in those cases have application to our determination of whether the attorney-client relationship had been established.

 It is well established that the "attorney-client relationship" is a contractual relationship, whereby an attorney agrees to render professional services for a client. *Yaklin*, 875 S.W.2d at 383. To establish the relationship, the parties must explicitly or by their conduct manifest an intention to create it. *Parker v. Carnahan*, 772 S.W.2d at 156. Stated another way, if the relationship is not expressly created, it may be implied from the conduct of the parties. *See Kotzur v. Kelly*, 791 S.W.2d at 257. The determination of whether there was a meeting of the minds must be based on objective standards of what the parties said and did and not on their alleged subjective states of mind. *See Argonaut Insurance Company v. Allstate Insurance Company*, 869 S.W.2d 537, 540 (Tex. App.—Corpus Christi 1993, writ denied); *Adams v. Petrade International, Inc.*, 754 S.W.2d 696, 717 (Tex.App.—Houston [1st Dist.] 1988, writ denied).

Appellant does not cite any cases to support his assertion that his mother's agreement with Fickman created the attorney-client relationship between he and Fickman, and we know of none. We recognize that under somewhat similar facts in *Upton*, the Court of Criminal Appeals rejected the State's argument that no attorney-client relationship had been established. In that case, an attorney went to the county jail to speak to a defendant at the request of the defendant's mother-in-law. Unlike what occurred in the instant case, however, the police interrupted their interrogation of the defendant

and allowed him to speak with counsel for a substantial length of time. During that conference, counsel advised the defendant not to speak with the police about his case. He also told the police that he had advised Appellant not to give them any statement. Nevertheless, the police resumed their questioning of the defendant, and over the next several days, obtained both false and incriminating statements. The Court, noting that the State failed to cross-examine the attorney or the defendant on the issue of whether the defendant had accepted counsel's representation, held that all of the evidence in the record supported a finding that the relationship had been established. *Upton*, 853 S.W.2d at 557. We find the instant case distinguishable from *Upton* in that counsel did not meet with Appellant, discuss the case with him, or give him any legal advice.

Certainly, an express agreement existed between Fickman and Mrs. Cobb to provide Appellant with legal representation in the instant cause. However, in the absence of any evidence that Mrs. Cobb was authorized to enter into an attorney-client relationship on Appellant's behalf, the trial court could have properly concluded that the agreement between Fickman and Mrs. Cobb did not establish the attorney-client relationship as between Fickman and Appellant, or at least not until Appellant accepted that representation. That acceptance did not occur until after he had given his statement.

Appellant also does not cite any authority for the proposition that an attorney-client relationship existed due to Fickman's prior representation of him, particularly where that representation had concluded, or because he occasionally spoke to Fickman when his brothers were in jail. We find that no attorney-client relationship was created by these circumstances. *See Dillard v. Broyles*, 633 S.W.2d 636, 643 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.), *cert. denied*, 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983) (unless there is special agreement, attorney-client relationship terminate once purpose of employment is completed); *Shropshire v. Freeman*, 510 S.W.2d 405, 406–07 (Tex.Civ.App.—Austin 1974, writ ref'd n.r.e.) (evidence that attorney had performed legal services for decedent in two instances over the years and had made statement that he had "taken care of these people for a long time" was insufficient to establish that attorney-client relationship existed between decedent and attorney).

A review of the record also reveals that the trial court could have properly found that the existence of the attorney-client relationship could not be implied from the conduct of the parties. Rather than looking solely to Appellant's testimony regarding his subjective belief or opinion about the existence of the relationship, we must look to Appellant's acts and words as well as to the circumstances in existence at the time he gave his statement. Appellant's conduct at the time of his arrest and during the giving of his statement are contrary to his alleged subjective belief that he and Fickman had a "pre-existing attorney-client relationship." Specifically, Appellant never mentioned to the police his prior relationship with Fickman or that he allegedly believed Fickman to be his attorney. In fact, when advised of his right to counsel, Appellant asked only whether Silva thought he should get a court-appointed attorney and did not mention Fickman. Thus, the objective facts found in the record do not support Appellant's assertion that he believed Fickman was his attorney at the time of his arrest.

For these reasons, we conclude that the evidence supports the trial court's implied finding that no attorney-client relationship existed between Appellant and Fickman at the time the written statement was obtained. The trial court properly concluded that there was no Sixth Amendment violation. Point of Error No. Three is overruled.

Having overruled Points of Error Nos. One, Two, and Three, the judgment of conviction is affirmed.